IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 2, 2020

## IN RE WALTER B.

**Appeal from the Circuit Court for Montgomery County**
**No. CC-19-CV-0326       Ross H. Hicks, Judge**

## No. M2020-00069-COA-R3-PT

The trial court terminated a father's parental rights on the ground of severe child abuse. The father argues that the trial court erred in finding that he committed severe child abuse and in finding termination to be in the child's best interest. He asserts that there was no evidence that he knew or should have known about the child's injuries. In light of all of the facts, including the nature of the child's injuries, the medical evidence, and the trial court's finding concerning the father's credibility, we conclude that the trial court did not err in terminating the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CARMA DENNIS McGEE, and KRISTI M. DAVIS, JJ., joined.

Brian E. Price, Clarksville, Tennessee, for the appellant, Joshua B.

Herbert H. Slatery, III, Attorney General and Reporter, and Lexie Ashton Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Elizabeth B.R. ("Mother") and Joshua B. ("Father") are the parents of Walter B., who was born in early July 2017. Although key facts in this case are in dispute, we will begin with a review of the essential, undisputed facts. The parents took Walter to the hospital near their home on the evening of September 5, 2017, after noticing that his leg appeared to be injured. The child was transferred to Vanderbilt Children's Hospital, where

he was evaluated by Dr. Elizabeth Copenhaver, a member of the hospital's child abuse response and evaluation ("CARE") team.[1]

Dr. Copenhaver's examination of the child along with x-rays revealed significant injuries. Walter had an acute (recent) spiral fracture of his right femur. Dr. Copenhaver opined that an infant of Walter's age was not developmentally able to cause such a fracture on his own, that the mechanism described by the parents (of a parent rolling over on the child during sleep) was not consistent with the injury, and that the effects of the injury would have been noticeable to the parents. She stated that this type of injury was the result of the application of a "twisting-type force on his leg." Dr. Copenhaver also found an acute nondisplaced angulated fracture of the child's lower right arm, which she opined would have been caused by "a bending-type force." As before, the injury was not consistent with the parents' explanation and could not have been caused by the child. Dr. Copenhaver was concerned about child physical abuse.

Dr. Copenhaver further found eight rib fractures in different stages of healing, indicating "multiple insults" at different times. She opined that these fractures occurred at least seven days before the child's hospitalization. Walter was also diagnosed with a healing fracture of his clavicle. Although Dr. Copenhaver noted that shoulder fractures are common during traumatic births, Walter's birth had not been traumatic. Moreover, the stage of healing of the fracture was not consistent with a birth injury. Additional findings made by Dr. Copenhaver were a healing scar and two bruises on Walter's left cheek and two linear healed scars on his right forearm.

In her deposition, Dr. Copenhaver testified that the femur and arm fractures would have been easily detectible to an untrained eye:

> They [the child] would have been extremely fussy. They would have -- his femur was not normally aligned any longer, so it would have had some form of — it wouldn't have been straight, so it would have had an angle or something would have looked different. By the time he got to the emergency room, they documented that there was swelling, so one would have looked different than the other one that was not fractured. He most likely would not have been moving that side of his body as much as the other side or a different amount of movement compared to what he normally would have been before the injury was sustained.

The doctor further stated that the effects of the rib fractures would have been noticeable to the child's parents. If the parents picked the child up or held him, he may have become fussier and more difficult to console.

---

[1] All parties stipulated at trial that Dr. Copenhaver is an expert in child abuse pediatrics.

After ruling out the presence of underlying medical conditions that could have caused these types of injuries, Dr. Copenhaver diagnosed Walter with child physical abuse. In her opinion, the child had suffered multiple instances of physical abuse or non-accidental trauma. The matter was referred to the Department of Children's Services ("DCS" or "the Department").

Melanie Campbell, a DCS child protective service investigator, met with Dr. Copenhaver at Vanderbilt and then interviewed the parents. She, too, concluded that Walter's injuries were the result of child abuse. Based upon her investigation and the absence of a suitable placement with family or friends, Ms. Campbell directed that the child enter state custody.

On April 25, 2019, DCS filed a petition to terminate Mother's and Father's parental rights to Walter. The matter was heard on October 9, 2019. In an order entered on December 12, 2019, and amended on August 21, 2020, the trial court terminated Mother's and Father's parental rights on the ground of severe child abuse. Father has appealed.[2]

STANDARDS GOVERNING PARENTAL TERMINATION TRIAL PROCEEDINGS AND APPELLATE REVIEW

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521-22 (Tenn. 2016) (citing U.S. Const. amend. XIV, § 1; Tenn. Const. art. 1, § 8). Although this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights in certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51.

Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists, *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best

---

[2] Mother is not a party to this appeal.

interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Terminating a parent's rights is one of the most serious decisions courts make. The termination of "parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), and of "severing forever all legal rights and obligations of the parent or guardian," Tenn. Code Ann. § 36-1-113(l)(1). Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. Evidence that meets the clear and convincing evidence standard "'enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). Such evidence "establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d at 523-24 (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

ANALYSIS

The issues raised by Father on appeal are (1) whether the trial court erred in terminating his parental rights based on its finding that the child was a victim of severe child abuse pursuant to Tenn. Code Ann. § 37-1-102(b)(27); and (2) whether the trial court erred in finding that termination of Father's parental rights was in the best interest of the child.

I.      Severe child abuse.

Tennessee Code Annotated section 36-1-113(g)(4) states that a person's parental rights may be terminated on the ground that the parent "has been found to have committed severe child abuse, as defined in § 37-1-102" under a prior court order or by the court hearing the petition to terminate parental rights or petition for adoption. Pursuant to Tenn. Code Ann. § 37-1-102(b)(27), "severe child abuse" is defined, in pertinent part, to mean:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>     (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(c).

Tennessee Code Annotated section 39-15-402(c) defines "serious bodily injury to the child" as including, but not being limited to, the following:

> second- or third-degree burns, *a fracture of any bone*, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects and acts of female genital mutilation as defined in § 39-13-110.

(Emphasis added).

In terminating Father's parental rights under Tenn. Code Ann. § 36-1-113(g)(4) based upon severe child abuse, the trial court relied upon the following factual findings and legal conclusions:

> In this case there is clear and convincing evidence that the Respondents perpetrated severe child abuse on the child by knowingly exposing the child to or failing to protect the child from abuse or neglect that was likely to cause serious bodily injury. There is also clear and convincing

evidence that the child suffered severe bodily injury from fractures to his wrist, femur, eight ribs and his clavicle. Further, there is clear and convincing evidence that the Respondents were presented with sufficient facts from which they could have and should have recognized that severe child abuse had occurred or would occur to the minor child. Finally, there is clear and convincing evidence that they possessed actual knowledge of the relevant facts and circumstances and deliberately ignored or recklessly disregarded the information that was presented to them. The Court finds that their inconsistent statements with regard to the sequence of events which occurred during the two weeks prior to the child's injuries being discovered creates a serious question as to their credibility. This is particularly true in view of what appears to be their after the fact agreement to place the blame for the child's injuries on Mother and absolve the Father of any responsibility in hopes that although Mother might lose her parental rights, Father would be able to maintain his and that in the future, Father would continue to allow Mother to be involved in the child's life and to exercise parental rights with the child.

On appeal, Father asserts that the proof "failed to show that the Father knew or should have known about the injuries suffered by the child." A person engages in "knowing" conduct when the person "'has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.'" *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *3 (Tenn. Ct. App. Apr. 23, 2020) (quoting *In re S.J.*, 387 S.W.3d 576, 592 (Tenn. Ct. App. 2012)). Under this standard, "'[a] parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur.'" *Id.* (quoting *In re Caleb J.B.W.*, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *5 (Tenn. Ct. App. July 14, 2010)). Moreover, in cases such as the present one "where the injuries are inflicted on preverbal infants and children, there is often no witness to the injury other than the parent or caregiver." *In re S.J.*, 387 S.W.3d at 592. Therefore, "[t]he 'knowing' element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver." *Id.*

In determining whether severe child abuse is established by clear and convincing evidence, we must "'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" *Id.* at 591 (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). The specific underlying facts, including whether the parent's conduct with respect to the child's injuries was "knowing," "need only be established by a preponderance of the evidence." *Id.* at 592. Once the facts have been proven, the court

must examine "the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse." *Id.*

In the present case, Walter's injuries, which include multiple bone fractures, fall within the statutory definition for serious bodily injury (Tenn. Code Ann. § 39-15-402(c)) as required by Tenn. Code Ann. §36-1-113(g)(4) for termination to be based on severe child abuse. The trial court's factual findings incorporated Dr. Copenhaver's testimony that the parents' explanation for the mechanism for the child's injuries was "not consistent with the injuries observed by the hospital" and that, "within a reasonable degree of medical certainty, the minor child's injuries were consistent with nonaccidental trauma and child abuse." These factual findings are well-supported by the evidence. Walter was two months old at the time when he was evaluated at the hospital and determined to be a victim of severe child abuse. Dr. Copenhaver testified that an infant of that age could not have caused the injuries sustained by Walter; for example, the child could not have applied the bending force needed to fracture his arm. Dr. Copenhaver ruled out the presence of underlying medical conditions that could account for the injuries. The femur fracture necessitated a twisting force to the leg, which was not consistent with the parents' explanation that the fracture was caused during co-sleeping. Moreover, the rib fractures manifested different stages of healing indicative of multiple injuries and were at least seven days old.

The trial court also found, consistent with the testimony of both parents, that Mother and Father were the only caregivers with access to Walter during the two weeks preceding the child's injuries. In *In re S.J.*, a case involving injuries to an infant, the child suffered rib fractures (and other injuries) while in the parents' care and neither parent could provide an explanation for the fractures. *In re S.J.*, 387 S.W.3d at 592-93. Under these circumstances, we noted that "we need not have an admission by Mother or an eyewitness to find Mother responsible for [the child's] rib fractures." *Id.* at 593. Rather, "the evidence preponderate[d] in favor of a finding that Mother either knowingly inflicted the serious bodily injury on [the child] or knowingly failed to protect him from the serious bodily injury." *Id.*; *see also In re Devonta L.C.*, No. E2012-00678-COA-R3-PT, 2013 WL 395977, at *11-12 (Tenn. Ct. App. Jan. 31, 2013) (finding severe child abuse by both parents where there was serious bodily injury while in the parents' care, "no reasonable explanation was shown for those injuries other than abuse," and "the injuries occurred 'on their watch' and . . . they failed to protect [the child] from being injured").

The trial court found that both parents perpetrated severe child abuse against Walter. This court has previously stated that it is not necessary for a court to "identify which parent physically applied the violent force necessary to inflict the injuries" under the following circumstances:

> [I]n view of the medical evidence, other facts as found by the Trial Court, and the Trial Court's credibility determinations, there were sufficient facts

- 7 -

presented to Mother and Father from which, at a minimum, each could have and should have recognized that severe child abuse had occurred or that it was highly probable to occur and that the other parent was the abuser.

*In re E.Z.*, No. E2018-00930-COA-R3-JV, 2019 WL 1380110, at *18 (Tenn. Ct. App. Mar. 26, 2019). In addition to the previously-discussed factual findings, the trial court questioned the credibility of Mother and Father. The court specifically cited (1) Father's (and Mother's) inconsistent statements regarding the sequence of events during the two weeks leading up to Walter's evaluation at the hospital and (2) text messages indicating an agreement between Mother and Father to find a way to allow Father to maintain custody of the child and then allow Mother to have parenting time.

As to the inconsistencies in Father's statements, the trial court made a number of relevant factual findings, all of which are supported by the evidence in the record. When he was initially interviewed by Ms. Campbell, Father stated that Mother told him "she had rolled on top of the minor child in the middle of the night" and that this conversation occurred on the morning of September 5, 2017. During Ms. Campbell's second interview with Father, he reported that the child was between him and Mother on the bed on the night of September 4, 2017, and the child was no longer in the bed but had been moved to his bassinet when Father got up the next morning (September 5, 2017) at around 5:00 a.m. to go to PT. Father observed the child crying when he returned home from PT and left for work; he stated that the child was still crying when he returned home again at the lunch hour.[3] Father reported that he held the child for a short time before returning to work. When Father came home from work at around 4:00 p.m., he and Mother discussed giving the child a bath. According to Father, Mother called him into the bathroom and pointed out that the child's leg was "loose." He stated that he had noticed bruising on the child's face earlier that day. Mother told Ms. Campbell that she had caused the bruising on Walter's face when she pinched his cheek two weeks prior to the interview.[4]

The version of events that Father related to Dr. Copenhaver varied somewhat from both of his statements to Ms. Campbell. The trial court adopted the following relevant portion of Dr. Copenhaver's testimony:

He (the father) -- the story he provided was that [the child] was in his normal state of health on the evening of September 4th. The family had fallen asleep in the bed. Walter was in a crescent shaped pillow when Father fell asleep.

---

[3] Mother testified that Father did not come home for lunch that day.

[4] Mother testified at trial that she also told Dr. Copenhaver that Walter's leg "went under his buttocks while she was placing him in the walker." Mother stated that she tried to pull the child's leg out from under him and through the leg hole of the walker, and the child started to cry. Dr. Copenhaver's records do not include this account of a possible cause of injury. Moreover, Mother did not mention this scenario to Father when he returned home from work on September 5, 2017.

When Father woke up on the morning of September 5th, the baby had been moved to the bassinet and Mom had said that she had fallen a -- when she was asleep, she ended up on top of Walter. He was not fussy at that time when Father left for work, but when he came back from his morning drills and throughout the day, Walter was kind of whimpering in his crib. Father said he did not touch him at that time. Father returned home close to 7:00 p.m. and Walter was having a bath soon after that. And Mom said his leg felt loose and so Dad touched it, knew that it was freely moving and became concerned, and then they took him to the hospital.

Both parents claimed that Walter was a colicky baby and that they attributed his frequent crying to this fact. Mother testified that Walter was diagnosed with colic while the family was in North Carolina at Christmas of 2016, which was before the child's birth. When reminded of this inconsistency, Mother could not identify a date when Walter was seen by a doctor in North Carolina. Neither parent submitted any documentation that the child was ever treated for colic.

Contrary to his statements to Ms. Campbell, Father testified at trial that he did not go home for lunch on September 5, 2017, and that he did not arrive home after work until 7:30 in the evening. He further stated his belief that Mother had caused Walter's injuries but could not say whether the injuries were intentional or unintentional because he was not at home. Father admitted, however, that he helped care for the child when he was not at work (from approximately 5:00 a.m. to 6:00 p.m.) and that he had the day off the two Sundays preceding the child's hospitalization. According to Father, during the two weeks prior to the child's hospitalization, the child "showed no signs of injury," but Father also testified that the child was "crying, continuously fussy." Father testified that he "rarely cared for the child," that the child was "a daddy's boy," and that Mother would give the child to him so that she could "cool off."

The text message exchanges referenced in the portion of the trial court's order questioning the parents' credibility are the following:

Father: "Are you still admitting to the injury?"
Mother: "Yes. You were not home when it happened."
Father: "The kids need to stay with me throughout the school year."
Mother: "And I will get them during the summer, and no visitation bullshit. Either I get them during the summer, which is two months, and you get them during the school year, which is nine months."
Father: "As long as you admit in court you did it, I'm fine, and they will be fine."

Mother also sent Father the following text message:

"I have nothing shady planned. I really don't. I've never said that you was involved in drugs at all. I do plan on getting me a lawyer in Tennessee where I can have my rights so they don't get terminated so we could be a – of either of my kids."[5]

When questioned about these text messages at trial, Father claimed that there were other conversations in which he made clear that Mother's time with the children would be supervised. The trial court found that Father's testimony regarding the text messages "vacillated and was, at times, inconsistent." The court further found that Father "was unable to explain why he would allow the mother to have access to, and visitation with, the child if he believed her to be the perpetrator of abuse."

A trial court's findings involving witness credibility are entitled to "considerable deference," and we will not reverse such a finding absent "'clear, concrete, and convincing evidence'" to the contrary. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990)). The record contains no basis to overcome our deference to the trial court's finding that Father's credibility was in "serious question."

In this case, the evidence does not preponderate against the trial court's findings of fact. As in *In re E.Z.*, those factual findings, including the medical evidence and the trial court's credibility determinations, establish that, at a minimum, Father "could have and should have recognized that severe child abuse had occurred or that it was highly probable to occur and that the other parent was the abuser." *In re E.Z.*, 2019 WL 1380110, at *18. Dr. Copenhaver testified that Walter's injuries would have caused noticeable effects including excessive fussiness, marked malalignment of the leg, swelling, and limited to no motion on the injured side of the body. Dr. Copenhaver testified that the rib fractures likely occurred at least seven days before the parents sought treatment for Walter. The combined weight of the facts provides clear and convincing evidence that Mother and/or Father subjected Walter to "severe child abuse and that the other parent covered for the other rather than protect [the child] from the severe child abuse." *Id.*

While in the care of Father and Mother, Walter suffered serious bodily injuries caused by non-accidental force that would have elicited abnormal responses alerting the child's parents that something was wrong. The trial court did not err in finding that Father's parental rights were subject to termination based upon severe child abuse.

II.    Best interests.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Father's parental rights, we must next consider whether the trial

---

[5] Father and Mother are the parents of a second child born after Walter.

court properly determined that termination of Father's parental rights was in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent, and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court is to consider the following non-exclusive factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof." *In re Gabriella D.*, 531 S.W.3d at 682.

In this case, the trial court found that all nine of the statutory factors weighed in favor of finding the termination of Father's parental rights to be in the child's best interests. Father disputes the trial court's best interest determination as to each of the nine statutory factors, arguing that "the evidence was insufficient to meet the standard of clear and convincing evidence." As stated above, however, the facts considered in the best interest analysis must be proven by a preponderance of the evidence only. *In re Kaliyah S.*, 455 S.W.3d at 555. In deciding the ultimate question of whether termination is in the child's best interest, the court considers "the combined weight" of the facts to determine if "they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

As to factor one, Tenn. Code Ann. § 36-1-113(i)(1), Father has not made "an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest" for Walter to return home. Father emphasizes the fact that he completed the requirements of the permanency plan developed by DCS. But, this fact does not tell the whole story. During trial, Father continued to deny any responsibility for the injuries suffered by Walter, either because of his own abusive actions or because of his failure to protect the child from Mother's abusive actions. Jamin Pena, a DCS caseworker, testified that she did not think it would be appropriate for the child to go back to Father because she observed that Father "gets angry very easily. Via text message, phone calls, and even in person, he gets very aggressive where we have to tell him to calm down." She witnessed angry outbursts from Father on more than five occasions.

With regard to the second statutory factor, Tenn. Code Ann. § 36-1-113(i)(2), which addresses changes made by a parent after reasonable efforts by DCS to assist him or her, Father makes much the same argument as he did with respect to factor one. He further notes that he "took advantage of the services offered to him by completing the psychological evaluation." For the reasons discussed above with respect to factor one, the evidence supports the trial court's finding that this factor weighs against returning the child to Father.

Factor three, Tenn. Code Ann. § 36-1-113(i)(3), inquires whether the parent has maintained regular visitation. As Father points out, he did maintain visitation with Walter throughout the case. Ms. Pena testified that Father interacted appropriately with the child, but noted that there were "times where he is on the phone." When this fact was brought to Father's attention, Ms. Pena stated, "he has become upset, and he threatens to call his attorney." This would occur in the presence of the child. The Department further points to Ms. Pena's testimony that there were instances when the person supervising visitation had to ask Father to calm down in front of the child. Regardless of Father's questionable actions during his visitation, we find it significant that he consistently participated in visits with Walter, thus evidencing his commitment to maintaining his relationship with the child. We find that the evidence preponderates against weighing factor three against Father.

Factor four, Tenn. Code Ann. § 36-1-113(i)(4), asks whether there is a meaningful relationship between parent and child. As to this factor, Father emphasizes his consistent visitation with Walter. Father testified that the child called him "Dada," and he argues that this fact illustrates that there is a meaningful relationship between father and son. Ms. Pena, however, testified that, to the best of her knowledge, the child did not refer to Father as "Daddy." She stated that Walter would run up to Father (and Mother) and hug him. Ms. Pena did not consider this interaction indicative of a meaningful relationship because the child interacted with her in the same way. Walter was two years (27 months) old at the time of the hearing and had been living with the same foster family since he was two months old. He calls his foster parent "Mom." Overall, the evidence does not preponderate against the trial court's finding "that there is no meaningful relationship between the parents and the child."

Considering "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition" is the subject of factor five, Tenn. Code Ann. § 36-1-113(i)(5). Father again relies upon his consistent visitation as evidence of a meaningful relationship between him and the child and asserts that changing caregivers "would not have a detrimental effect on the child." We disagree. As discussed under factor four, the evidence supports the trial court's finding that there was no meaningful relationship between Father and the child. Walter has lived with the foster family for almost his entire life. The evidence shows that he is a happy child, well-situated in the foster home. The evidence does not preponderate against the trial court's finding that "changing caregivers at this stage of the child's life would have a detrimental effect on the child."

Given our analysis regarding the severe child abuse ground for termination, we need not devote extensive discussion to factor six, Tenn. Code Ann. § 36-1-113(i)(6), which asks whether the parent or another person in the household has shown brutality, abuse or neglect toward the child. We agree with the trial court that there is clear and convincing evidence to support termination on the ground of severe child abuse, and there is ample

evidence in the record (detailed above) to support the trial court's finding of severe child abuse as part of the best interest analysis.

Under factor seven, Tenn. Code Ann. § 36-1-113(i)(7), a court is to consider, among other things, whether the parent's home provides a safe and healthy physical environment and "whether there is criminal activity in the home." Father devotes his argument on appeal to challenging the trial court's purported consideration of alleged criminal charges, which he asserts were dismissed. As Father points out, no documents were presented to show the existence of such charges. It was not necessary, however, for the trial court to consider the allegations of criminal activity by Father in order to conclude that factor seven should weigh against him. Walter sustained multiple serious injuries from non-accidental trauma while in Father's care. Father has not offered a satisfactory explanation for the injuries or accepted responsibility for failing to protect his child. Father's home is not a safe place for Walter.

As to factor eight, Tenn. Code Ann. § 36-1-113(i)(8), regarding Father's mental and emotional state, we agree with Father that the record contains no evidence on this point. The Department makes no argument regarding this factor, and we consider the factor to have no effect in this case.

Factor nine, Tenn. Code Ann. § 36-1-113(i)(9), asks "[w]hether the parent or guardian has paid child support consistent with the child support guidelines." Ms. Pena testified that the permanency plan developed by DCS required Father to pay child support and that "he does pay the child support." Thus, this factor should weigh in Father's favor, and the evidence preponderates against the trial court's decision otherwise.

In addition to the enumerated factors, the trial court cited "the need for permanency and the child's placement in a pre-adoptive home" as factors in favor of terminating Father's parental rights. Relying on his consistent visits, his testimony that he does not consume alcohol or narcotics, and his military career, Father argues that he can provide a safe home for Walter. Looking at the evidence from the child's perspective, however, we conclude that the evidence does not preponderate against the trial court's decision to weigh these factors against Father and in favor of terminating his rights.

Although a few of the statutory factors favor Father, most weigh against him. Moreover, the best interest determination "is a fact-sensitive inquiry." *Steakin v. Steakin*, No. M2017-00115-COA-R3-CV, 2018 WL 334445, at *5 (Tenn. Ct. App. Jan. 9, 2018). The determination "'does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent.'" *Id.* (quoting *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005)). Rather, "'[t]he relevancy and weight to be given each factor depends on the unique facts of each case.'" *Id.* (quoting *In re Marr*, 194 S.W.3d at 499). Viewing the combined weight of all of the trial court's factual findings, we find clear and convincing evidence exists to support

the court's determination that termination of Father's parental rights is in the child's best interest.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Joshua B., and execution may issue if necessary.


               _____
               ANDY D. BENNETT, JUDGE